**John WOODY et al., Appellants,**

**v.**

**STERLING ALUMINUM PRODUCTS, INCORPORATED, a Missouri Corporation, International Association of Machinists, District No. 9, International Association of Machinists, Local Lodge 41 of the International Association of Machinists, Larry Connors, Directing Business Representative, District No. 9, I. A. of M., Russell Davis, Business Representative, District No. 9, I. A. of M., Appellees.**

**No. 18083.**

United States Court of Appeals Eighth Circuit.

Sept. 2, 1966.

Rehearing Denied Oct. 11, 1966.

---

Jerome J. Duff, St. Louis, Mo., for appellants.

Daniel Bartlett, Sr., of Bartlett, Stix & Bartlett, St. Louis, Mo., for appellee Sterling Aluminum Products Inc.; William Stix and Daniel Bartlett, Jr., of Bartlett, Stix & Bartlett, St. Louis, Mo., on the brief.

Donald S. Siegel, of Bartley, Siegel & Bartley, Clayton, Mo., for appellee Unions & Union Representatives; Malcolm L. Bartley and William H. Bartley, of Bartley, Siegel & Bartley, Clayton, Mo., on the brief.

Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and VAN PELT, District Judge.

MEHAFFY, Circuit Judge.

Plaintiffs, one hundred ninety-three former machinist employees of Sterling Aluminum Products, Incorporated (Sterling), at Sterling's St. Charles, Missouri plant, have appealed from a judgment of the United States District Court for the Eastern District of Missouri dismissing their complaint against Sterling, plaintiffs' local bargaining unit (Union), the international and individual union representatives.[1] Plaintiffs sought millions of dollars in damages for breaches by Sterling of a collective bargaining agreement, alleged to have been collusively negotiated by Sterling and plaintiffs' exclusive bargaining agent, District No. 9. Some two years after the St. Charles plant was closed, plaintiffs by amendment sought enforcement of the grievance procedure contained in the collective bargaining agreement.

There are two published opinions of the District Court. In the first opinion, dealing with the original and first amended complaint, the District Court entered summary judgment for Sterling on Count III and dismissed the other three counts upon motion.[2] 244 F.Supp. 84 (E.D.Mo.1965). Thereafter, however, by nunc pro tunc order entered January 26, 1965 plaintiffs were granted the right to file what is hereafter referred to as the second amended complaint.

This second amended complaint contained six counts and resulted in a decision adverse to plaintiffs on all counts. 243 F.Supp. 755 (E.D.Mo.1965). Both opinions deal exhaustively with the facts and legal issues, so we summarize as briefly as possible in a case made complex and annoyingly difficult because of the garbled overlapping and contradictory allegations of the pleadings.

In 1961, in settlement of a five-month strike at Sterling's St. Charles plant, the Union and Sterling negotiated a two-year contract to terminate February 28, 1963. A major issue involved severance pay and a chief topic of discussion was the possibility that Sterling might move its production from St. Charles, Missouri. Initially, Sterling adamantly refused to consider any such provision because it had been concluded due to many factors that the St. Charles operation could no longer be profitably maintained. However, the negotiated contract contained an express provision recognizing Sterling's right to permanently close the St. Charles plant at any time during the contract term or to permanently discontinue all or part of any department and terminate the involved employees.[3]

---

1. The Unions made parties defendant were the International Association of Machinists; District No. 9, International Association of Machinists of which plaintiffs were members; and Local Lodge No. 41 of the International Association of Machinists. Individual parties defendant were Larry Connors and Russell Davis, business representatives of District No. 9.

2. The complaint was almost immediately replaced with the first amended complaint.

3. "(j) The Union recognizes the right of the Company in its sole discretion at any time during the term of this agreement, to close down permanently its plant at St. Charles or to discontinue permanently a department of the plant or a substantial

The contract called for termination allowances for the employees scaled to their length of service but to be effective only if the St. Charles operations were relocated during the life of the contract. Sterling was relieved of its obligation to pay the seniority termination allowance if the plant closure or department phase-out occurred after the expiration of the two-year contract.[4]

On December 26, 1962, Sterling, by mail, notified the Union that the St. Charles plant would be permanently closed on the expiration date of the contract, February 28, 1963. The Union agreed to terminate the agreement and offered proposed amendments to which Sterling reiterated the permanent closing of the plant but expressed a willingness to discuss current contract matters before termination on February 28. The Union was also advised that since it did not represent Sterling employees at other plants and since no workers would be employed at St. Charles, the negotiation of a new contract would be unnecessary.

On February 27, 1963, employees were officially notified that the plant would be permanently closed at the end of the day, February 28, and that all employees would be terminated at that time. Employees were not to report to work February 28 but would be compensated for that day.

For several months prior to closure of the St. Charles plant, it was common knowledge that operations would be moved to Malden, Missouri and that Sterling had leased production facilities in Malden on November 23, 1962.

During this period, Sterling had indications that illegal efforts would be made to damage the St. Charles property. Defective pistons sent to customers required reimbursement of $20,000 for damages to assembled engines in which the pistons had been installed. An experienced production worker produced 2,000 truck pistons with tapered instead of square cut grooves, an obvious malfabrication readily admitted by a Union official. Plaintiff John Woody reported an unusual amount of scrap accumulating which could be corrected if he were elevated to foreman. More important were the threatening telephone calls to Sterling's president creating apprehension of serious damages to the company property which included expensive and sensitive machinery. Thus, the decision to deny plaintiffs access to the plant on the last working day although they would be compensated.

Plaintiffs' original complaint was filed September 13, 1963, some six months after closing of the plant. We are first concerned with the disposition of Count III in the first amended complaint as this was resolved with finality by the District Court's granting Sterling's motion for summary judgment.

*Count III of First Amended Complaint.*

In Count III, plaintiffs sought damages against Sterling for loss of seniority termination benefits alleged to be due

---

portion thereof and terminate the employment of individuals. The employee whose employment is terminated either directly or indirectly as a result thereof because he was not entitled to other employment with the Company under the provisions of Article IV, Seniority, shall be entitled to a seniority termination allowance providing such termination for reasons set forth above occurred after March 1, 1961. Such allowances shall be in accordance with the following schedule:

3 to 5 years with the Company, 2 weeks' pay;

5 to 7 years with the Company, 3 weeks' pay;

7 to 10 years with the Company, 4 weeks' pay;

10 years or more with the Company, 5 weeks' pay;

computed at his base rate of pay.

"Temporary layoff for reasons other than those stated in the first paragraph of paragraph (j) during such two-year period shall not constitute termination entitling the employee laid off to such seniority termination pay as set forth above.

"It is expressly understood at the expiration of this two-year contract the Company shall have the right to close down permanently the St. Charles plant, to relocate permanently any department thereof or discontinue permanently any such department, without seniority termination pay."

4. See **note 3.**

under the provisions of the bargaining agreement. Plaintiffs alleged that termination was effectuated on February 27, 1963, whereas the contract expired on February 28, 1963.

Sterling moved to dismiss for (1) lack of jurisdiction; (2) lack of individual capacity to sue on the matter involved; and (3) failure to state a claim upon which relief could be granted.

Plaintiffs and Sterling filed motions for summary judgment, both being accompanied by affidavits.

Assuming jurisdiction, a simple construction of the contract is involved and we agree with the District Court's interpretation and also its conclusion that undisputed evidence, supporting the summary motions, reflects that plaintiffs were not terminated until the contract had expired, and hence not entitled to judgment for termination allowances.

A serious question exists, however, as to plaintiffs' right to bring this action because of failure to exhaust their contract grievance procedure remedies. The District Court seriously questioned its jurisdiction but because of the parties' apparent waiver of those remedies proceeded to determine the issue on evidence before it.

The issue before us then is whether plaintiffs may seek federal court aid by an action on a collective bargaining agreement under § 301 (29 U.S.C.A. § 185(a)) without first exhausting the internal contract remedies.

Our duty to formulate a uniform body of substantive federal labor law for the enforcement of collective bargaining agreements has been recognized. Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). But the actual content of § 301 jurisdiction has not been defined and has rather been developed on a case-by-case piece-meal basis. The pre-emption of San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), depriving both state and federal courts of § 301 jurisdiction to hear individual complaints on contract breaches if the questioned activity is arguably subject to § 7 or § 8 of the National Labor Relations Act has now been explained so that "[t]he authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301." Smith v. Evening News Ass'n., 371 U.S. 195, 197, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962).

And though § 301 jurisdiction has been extended to "suits to vindicate individual employee rights arising from a collective bargaining contract," Smith v. Evening News Ass'n, supra at 200, 83 S.Ct. at 270, there remains the condition precedent "that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress." Republic Steel Corp. v. Maddox, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); Smith v. Evening News Ass'n., supra n. 1 (by implication); Belk v. Allied Aviation Service Co., 315 F.2d 513 (2 Cir., 1963), cert. denied, 375 U.S. 847, 84 S. St. 102, 11 L.Ed.2d 74 (1963).

In the case at bar, the bargaining agreement contains four steps detailing the internal grievance procedure for exclusive settlement of all differences between the employees individually and collectively and Sterling.[5] But there is no

---

5. "Section 3. Should differences arise between the Company and its employees either individually or collectively as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or if any trouble of any kind arises, an earnest effort shall be made to settle such differences at the earliest possible time by use of the following procedure:

"Step 1. The employee, the shop steward and the foreman shall attempt a satisfactory settlement of the grievance.

allegation in the pleadings or offer of proof that any attempt was made to use this contract grievance procedure. The admitted fact as seen from plaintiff Woody's affidavit is that no grievance was ever processed to the first procedural step. We have no authority to ignore or exceed the contract as it is both the source and extent of the aggrieved employee's rights under § 301. Republic Steel Corp. v. Maddox, supra.

Neither are plaintiffs saved by the possibility of Union refusal, hostility or "perfunctor[y]" representation for, so far as we can determine from the record, plaintiffs deliberately stripped Count III of any allegation of conspiracy between the Union and Sterling and sought a straight contract action for money damages predicated upon Sterling's decision to close the plant, allegedly executed during the life of the contract, thereby entitling plaintiffs to seniority termination allowance.

■ We, therefore, conclude that plaintiffs' failure to utilize the contract grievance procedure precludes their right to maintain the Count III action. Republic Steel Corp. v. Maddox, supra.

*Second Amended Complaint.*

On January 30, 1965, some two years after the closing of the St. Charles plant and termination of plaintiffs, the second amendment to the complaint was filed. This pleading sought an order restoring plaintiffs to the status quo of their employment at the time Sterling notified the Union of its intention to close the St. Charles plant; an order to pay all back pay and accrued benefits plus interest to the plaintiffs from February 27, 1963 to the date of the court order; an order requiring Sterling to commence bargaining with plaintiffs regarding all pending grievances; an order to bargain with respect to the closing of the plant; an order authorizing the shop steward to act in behalf of plaintiffs; and for any other or additional orders which the court deemed necessary to restore plaintiffs to the status quo of their employment conditions of December 1, 1962; for an order finding that the Union and its officials be jointly liable for back pay and accrued benefits with Sterling; and to further file grievances regarding the decision of Sterling to close its St. Charles plant and terminate plaintiffs. In the alternative,

"Step 2. If no satisfactory settlement is reached between the employee, shop steward and the foreman, the grievance must be referred in writing to the Department Superintendent who shall attempt to settle the difference between the employee, shop stewards, foreman and chief shop steward.

"Step 3. If any grievance is not settled by the foregoing methods it shall be considered by a committee composed of the Business Representative designated by the Unions, an officer of the Company and the group listed in Step 2. In the event it becomes necessary for the Chief Steward to visit either the department office or the main office on a grievance, the Chief Steward shall be accompanied by the department Steward involved and the aggrieved employee involved.

"Step 4. In the event the Company and the Unions cannot agree upon the disposition of the grievance, any such matter shall be submitted to arbitration by an impartial Arbitrator to be selected by mutual agreement between the Company and the Unions. In the event the Company and the Unions cannot agree on

selection of the Arbitrator within five (5) days (the time may be extended by mutual agreement) the Arbitrator shall be selected by the Company and the Unions from a panel of five (5) submitted by the Federal Mediation and Conciliation Service. The decision of the Arbitrator shall be final and binding on all parties. The Company and the Unions shall share equally the expense of the Arbitrator and each shall bear its own expense in arbitration. Should the Company refuse to arbitrate any dispute as herein set forth, the Unions shall be free to strike.

"Any agreement or settlement of differences arrived at between the Company and the Unions pursuant to this Section shall be reduced to writing.

"Section 4. The parties agree that as a part of the consideration of this contract any and all disputes and any and all claims, demands or action growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the preceding Section."

the second amended complaint sought an order requiring both Sterling and the Union to respond in damages to plaintiffs for the full amount of wages and accrued benefits which each plaintiff would have earned under the provisions of the contract to their normal employment retirement date.

The District Court found the second amended complaint violative of Fed.R. Civ.P. 8(a) and (e) in failing to "comply with the fundamental principles of good pleading," and characterized it as "unduly prolix, involved, repetitious and [of a] confusing nature" without separation of "inconsistent allegations." 243 F.Supp. at 759. Had the second amended complaint been dismissed under Rule 8, we would have been inclined to sustain the ruling. Wallach v. City of Pagedale, 359 F.2d 57 (8th Cir. 1966). The District Court, however, in the interest of finality proceeded to probe the pleadings

for an ascertainment of whether plaintiffs would be entitled to any relief under any statement of facts that might be proved in support of the complaint. Those efforts proving futile, the second amended complaint was dismissed upon defendants' motions. We have likewise canvassed the record in its entirety and agree with the correctness of the District Court decision.

Although the second amended complaint is indeed abstruse and asserts manifold claims framed in six counts,[6] it can be broadly stated that the legal issues involve only the jurisdiction of the federal court as to (a) claims for alleged breach of the bargaining contract and (b) claims for alleged failure of the Unions to represent their members in good faith by unlawfully conspiring and colluding with Sterling to permit the closing of the St. Charles plant and the termination of its employees.[7]

---

6. We are concerned here only with Counts I and V. Count III is identical with Count III of the first amended complaint which the District Court resolved with finality and was only included in the second amended complaint because a motion for new trial was pending and plaintiffs did not want to waive their rights under the court's previous order. Plaintiffs dismissed Count IV and Counts II and VI merely sought punitive damages. Count V in the main is a reallegation of the matters set forth in Count I and this count was directed solely at the Union.

7. Plaintiffs state their claims with somewhat more specificity in their complaint as follows:

"This Count of Plaintiffs' Complaint is predicated and founded upon an illegal and unlawful conspiracy and series of collusive acts comprising a deliberate, predetermined and illegal plan and scheme contrived and entered into by the Defendant, Sterling, by and through its agents and corporate officers, and the Defendant Labor Organizations and the Labor Organization Officials, Connors and Davis. The purpose of the collusion and conspiracy by and between these Defendants was to allow the Defendant, Sterling, to close down its plant in St. Charles, Missouri, and permanently terminate the employment and union recognition of all of these Plaintiffs and to attempt to eliminate and avoid any contractual and/or

legal liabilities to these Plaintiffs as a result of the permanant loss of their employment and the loss of the recognition of their Union. The collusion and conspiracy between these Defendants consisted generally of a series of acts and conduct which allowed the Defendant, Sterling to breach the terms and provisions of its labor-agreement with the Plaintiffs at will; the refusal of the Defendant, Labor Organizations, by and through the Defendant, Labor Organization Officials, to take any protective and/or remedial actions for and in behalf of the Plaintiffs when the Labor Organization Officials knew of frequent and repeated acts of breach of the labor-agreement by the Defendant, Sterling; the intention of these Defendants to discriminate in a hostile fashion against the employment and labor organizational rights of these Plaintiffs by the concerted refusal of the Defendant, Sterling to process the grievances of the Plaintiffs coupled with the failure and refusal of the Defendants Labor Organizations and Labor Organization Officials to file and/or process grievances in behalf of these Plaintiffs and the repeated misrepresentations by all of these Defendants to the Plaintiffs of the true facts and circumstances of the status of the Plaintiffs' employment coupled with the repeated breach of fiduciary duty and responsibility of representing the Plaintiffs

Preliminarily, we reiterate that the provision allowing Sterling to move its plant and terminate its employees resulted from negotiations during the course of a strike and was in fact the ratio essendi of the bargaining agreement. Neither plaintiffs nor the Union ever sought to process any grievance on account of the plant's closing, employees' termination, or Sterling's refusal of jobs at other plants. The complaint uses language of hostile discrimination and similar wordage in characterizing the Union's activity when in fact there was no discrimination whatsoever as all employees were treated alike. Further, the broad and colorful language suggesting that the Union was inimical to its constituents was not supported by any allegation of bribery, preference or anything else that would be indicative of substance to plaintiffs' broad charges. We do not discuss these matters in more detail because their lack of substance makes them unimportant in the light of our opinion that all of the charges in the complaint fail to establish jurisdiction of the federal court over the issues here involved.[8]

Accompanying plaintiffs' motion for summary judgment against Sterling was an affidavit of plaintiff John Woody which also identifies and attaches certain documentary exhibits. Woody stated that at all relevant times he was either chief shop steward or shop steward and an employee of Sterling. He further avowed:

"Affiant further states that each of the Exhibits identified as 'Grievances' and numbered Exhibit 3 (a through h) have been duly filed with the Defendant, Sterling. These Grievances have never been processed beyond the mere act of filing the Grievances. No Grievance was ever taken to step One as provided in Exhibit A (page 8). The processing of the said Grievance in behalf of Machinist Union employees of Defendant, Sterling, is one of the responsibilities of this Affiant as Chief Shop Steward."

Woody's affidavit was also supported by inter-union correspondence reflecting that several grievances had been processed—some settled satisfactorily—others not for lack of facts of a contract breach. Additionally, the correspondence reveals that the Union was unhappy and disturbed at Sterling's move but "in checking from all angles it seemed the company had stayed strictly legal." All of the defendants moved for dismissal of the amended complaint setting up lack of jurisdiction, failure to state claims upon which relief could be granted, as well as for other reasons not pertinent here. Sterling's response revealed that neither plaintiffs nor the Union had attempted a discussion or filed any grievance with Sterling respecting the plant closure, its removal, termination of employees, despite Sterling's reiterating in writing on January 14, 1963 its plan to close, remove and terminate plaintiffs and its expression therein of its willingness to discuss any subject within the scope of the then current labor contract.

fairly and honestly by the Labor Organization Officials to fully and fairly disclose to Plaintiffs the information and knowledge gathered by the Labor Organization Officials of the existing material and relevant facts and circumstances affecting the terms and conditions of Plaintiffs' employment."

8. It would unduly prolong this opinion to discuss all plaintiffs' various complaints. Some are specious on their face and subject to dismissal for failure to state a claim upon which relief can be granted. Examples are complaints with respect to matters predating the contract during the time of the strike and when no contract was in existence. Others failed to specify dates and could possibly have been during periods which would not give rise to a cause of action. Additionally, we have heretofore held that the Union alone has the right to negotiate broad policy issues such as re-negotiation of a new contract and relocation of a plant. The individuals have no vested interest in a company's operation being conducted at any certain location and Sterling had no duty to arbitrate this or any other issues that it had not agreed to arbitrate. See Brown v. Sterling Aluminum Products, Inc., 365 F.2d 651 (8th Cir. 1966).

■ Concerning ourselves first with all claims that can be construed to be breach of contract, we only have to look to the Woody affidavit to determine that the evidence before the District Court admittedly sufficed to conclusively show that plaintiffs have never attempted to process any unresolved grievance, even to Step 1 of the grievance procedure. Thus, plaintiffs had no standing in federal court on their alleged claims for breaches of contract which normally might give rise to § 301 jurisdiction. Therefore, *Maddox* is controlling of all alleged breach of contract claims.

■ Plaintiffs, however, suggest that the District Court has jurisdiction under the doctrine of "pendent jurisdiction"; that because the District Court resolved the issue of Count III of the first amended complaint on its merits, the federal court had jurisdiction of other matters and causes of action not otherwise cognizable in federal court. We have concluded that, under *Maddox*, it was unnecessary for the District Court to decide Count III on its merits. In any event, the causes of action now asserted depend on different facts and constitute separate and distinct causes of action and the rule of pendent jurisdiction has no application here.[9]

■ Our remaining jurisdictional issue concerns those allegations in Count I, charging the Union with conspiring and colluding with Sterling, bargaining in bad faith to plaintiffs' detriment, and failing to represent plaintiffs fairly and honestly. The District Court held that the plaintiffs' charges of the Union's bad faith in negotiating the collective bargaining agreement were not predi-

cated upon the collective bargaining agreement so as to give the court jurisdiction under § 301, but rather looked beyond the agreement to the exclusive bargaining representatives' obligation of fair representation and was within the exclusive jurisdiction of the National Labor Relations Board. We think this holding was correct. San Diego Bldg. Trades Council v. Garmon, supra; Local No. 100 v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963); Local No. 207 v. Perko, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963). We think it is at least arguable that these allegations, if true, would be an unfair labor practice within the protection of § 7 and prohibition of § 8 of the Act "although there are differing views on whether a violation of the duty of fair representation is an unfair labor practice under the Labor Management Relations Act. * * *" Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Unlike Moore, however, plaintiffs' allegations here are not contract oriented and not, therefore, "within the cognizance of federal and state courts." Smith v. Evening News Ass'n., supra.

Although *Garmon, Borden* and *Perko* involved complaints based upon a state cause of action and are not controlling in cases involving alleged violations of federal law, they are guidesome in determining the extent of § 301 jurisdiction and "when, for what kinds of breach and under what circumstances, an individual employee can bring a 301 action". Smith v. Evening News Ass'n., supra, 371 U.S. at 204, 83 S.Ct. at 272, 9 L.Ed.2d 246 (Mr. Justice Black dissenting).

---

**9.** In Hurn v. Oursler, 289 U.S. 238, 245, 53 S.Ct. 586, 589, 77 L.Ed. 1148 (1933), the Supreme Court stated:

"But the rule does not go so far as to permit a federal court to assume jurisdiction of a separate and distinct nonfederal cause of action because it is joined in the same complaint with a federal cause of action. The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a

federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the nonfederal *ground;* in the latter it may not do so upon the nonfederal *cause of action.*"

No precedent has been called to our attention and our research has revealed none that would vest the federal courts with jurisdiction under such circumstances as exist here. Indeed, to rule jurisdiction might well jeopardize the whole concept of collective bargaining as we know it. We are not prepared to pioneer the allowance of so drastic a step and, for this as well as the other reasons hereinbefore expressed, the judgment of the District Court is affirmed.