415 F.Supp. 792 (1976)
Alfred RUSSOM et al., Plaintiffs,
v.
SEARS, ROEBUCK AND COMPANY, a corporation, et al., Defendants.
No. 75-524C(4).
United States District Court, E. D. Missouri, E. D.
June 25, 1976.
*793 *794 Stan Platke, Taylor, Eichner, Hollander & Platke, Toby Hollander, St. Louis, Mo., for plaintiffs.
Harry H. Craig and Norman W. Armbruster, Robert G. Burridge, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, Mo., Lederer, Fox & Grove, Chicago, Ill., Donald J. Spero, Skokie, Ill., for defendants.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs brought suit, pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, alleging that defendant Sears, Roebuck & Company breached a collective bargaining agreement; that defendant Local 610 refused to accept grievances; and that all three defendants conspired to deprive plaintiffs of certain rights.
The case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1. Plaintiffs are all presently service employees of defendant Sears, Roebuck & Company. Prior to October 1, 1974 plaintiffs were all employees of Dependable Appliance Service, Inc. [DAS].
2. Defendant Sears, Roebuck & Company is a corporation engaged in a retail sales business which includes in part the sale and service of home appliances.
3. Defendant Local 688, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America is a labor organization within the meaning of the Labor Management Relations Act, 29 U.S.C. § 151 et seq. and is the exclusive bargaining agent of service employees of Sears, Roebuck & Company.
4. Defendant Local 610, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America is a labor organization within the meaning of the Labor Management Relations Act, 29 *795 U.S.C. § 151 et seq. and was the exclusive bargaining agent of the employees of DAS.
5. In 1956 DAS was formed for the purpose of providing service work for existing companies. DAS was organized before any service work was secured. Throughout its existence, DAS did substantially all of its business with Sears, Roebuck & Company. Sears trained DAS's initial workforce and from time to time throughout DAS's existence, its employees received additional training from Sears. There was no charge to DAS for this training.
6. Originally there was an hourly billing rate in existence between DAS and Sears. This changed, however, to a cost-plus system in which all cost items were passed on to Sears.
7. DAS employees were not paid by a check from Sears. Credible evidence established that Sears did not participate in labor negotiations between DAS and Local 610, nor did Sears ever sign any contract entered into by Local 610 and DAS. The evidence fails to establish that any employee of Sears was an officer or director of DAS or that any employee of DAS was an officer or director of Sears. Sears did not own stock in DAS, nor did DAS own stock in Sears. DAS maintained its employee records, which were never shown to Sears. DAS was in charge of the wages, hours and fringe benefits of its employees. DAS provided its employees liability and workmen's compensation insurance. DAS had control over the hiring and firing of its employees.
8. DAS employees did receive a 10% discount at Sears and in addition, were included in certain employee contests. DAS employees, in response to service calls, went to the homes of persons who had Sears appliances in need of repair. DAS employees greeted customers with "Sears Calling" and, if the customers were not home, left a Sears "Not-Home" tag.
9. DAS employees wore a Sears "Authorized Service" patch on their uniforms. DAS trucks bore a Sears logo and slogan and were painted in Sears "fleet colors". The trucks also bore the name of DAS.
10. In late 1970, Sears desired to hire two service employees itself, to be assigned to in-house repairs. An agreement was reached permitting Sears to hire the two employees, who were represented by Local 688 and were covered by a supplemental addendum to the collective bargaining agreement between Local 688 and Sears. After the two men were hired and the collective bargaining agreement was supplemented, in early 1971, DAS employees objected to Local 688 representing any service or repair men. After the President of the Joint Council of Teamsters # 13 was contacted, it was determined that rightful jurisdiction belonged to Local 610. Accordingly, Sears agreed to terminate the employment of the two individuals. These two individuals were subsequently hired by DAS. The addendum, covering service employees, however, remained in effect.
11. On September 9, 1974 a meeting was held at which it was announced that DAS would be going out of business. The decision was reached solely by John O. Baumler, the president of DAS, because of Mr. Baumler's age and health. It was indicated that Sears would offer employment to the DAS employees. There is some evidence that the successor clause in the DAS-Local 610 collective bargaining agreement was discussed, with the union indicating that the addendum clause in the Sears-Local 688 agreement precluded application of the successor clause in the DAS-Local 610 agreement. There was also evidence that some DAS employees, specifically plaintiff Roach, tried to file a grievance. Local 610, however, indicated that it could accept no grievances.
12. At a subsequent meeting on September 23, 1974, representatives from Local 688 were present. Local 688 informed the DAS employees that they would have to join Local 688 if they wanted to be represented by a union while employed at Sears. A majority of the DAS employees signed Local 688 authorization cards.
13. On October 1, 1974, Sears offered employment to substantially all of the ex-DAS *796 employees. These offers were accepted nearly unanimously.
14. Sears purchased some, but not all, of DAS's assets.
15. When DAS went out of business, the employees received severance checks. None of the plaintiffs have offered to return the same to Sears.
16. While DAS was in existence, and in accordance with the DAS-Local 610 collective bargaining agreement, DAS made payments on behalf of its employees to the Teamsters Pension Fund. The DAS employees' rights in said fund were not to vest until 1978. Accordingly, when DAS terminated its business, the DAS employees, and plaintiffs, lost their rights in said pension.
17. Local 688 and Sears had a number of bargaining sessions concerning the newly hired DAS employees from October 3, 1974 through February 13, 1975. The proposed contract was presented to the service employees (ex-DAS employees) at a meeting on February 13, 1975. The entire proposed contract was read to the employees. A majority voted by secret ballot to accept the contract, although there was testimony that some employees felt pressured into accepting the proposed contract. The contract, which was approved, did not provide for continued contributions by Sears to the Teamsters Pension Fund, (Sears has never contributed to such a pension fund), nor were the ex-DAS employees given seniority status from the date of their employment with DAS for benefit purposes.

CONCLUSIONS OF LAW
This Court has serious reservations concerning its alleged jurisdiction herein. Plaintiffs are proceeding on the basis of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In view of these concerns, the Court will analyze its jurisdiction in relation to each of the theories on which plaintiffs have proceeded herein.
As to plaintiffs' allegations of conspiracy, the Court concludes the jurisdiction is clearly lacking. Abrams v. Carrier Corporation, 434 F.2d 1234 (2nd Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971); Woody v. Sterling Aluminum Products, Incorporated, 365 F.2d 448, 456 (8th Cir. 1966), cert. denied, 386 U.S. 957, 87 S.Ct. 1026, 18 L.Ed.2d 105 (1967).
The Court, however, concludes that jurisdiction may exist to determine whether or not Sears and DAS were co-employers, the theory upon which plaintiffs have proceeded. Cf., Baker v. Fleet Maintenance, Incorporated, 409 F.2d 551 (7th Cir. 1969). But see, Morris, The Developing Labor Law 767 (1971) ("The Board has the duty of determining whether the relationship between certain parties constitutes an employer-employee relationship . . ."); Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (§ 301 jurisdiction exists as to claimed breaches of the duty of fair representation and other breaches grounded in the collective bargaining agreement itself). It is plaintiffs' contention that Sears, as a co-employer, should be bound by the substantive terms of the DAS-Local 610 collective bargaining agreement once DAS ceased doing business. The evidence establishes, however, that Sears can not be considered a co-employer with DAS.
The doctrine of co-employer originated with the National Labor Relations Board in the context of determining whether the Board would exercise jurisdiction over the particular dispute. See Radio & Television Broadcast Technicians Local Union 1264, International Brotherhood of Electrical Workers, AFL-CIO v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); Sakrete of Northern California, Inc. v. National Labor Relations Board, 332 F.2d 902 (9th Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). The criteria employed to determine if two employers are in fact to be considered as co-employers include the following:
1. Interrelation of operations;
2. Centralized control of labor relations;
3. Common management; and

*797 4. Common ownership or financial control.
No one of these factors has been held to be controlling but the Board opinions have stressed the first three factors, which go to show `operation integration,' particularly centralized control of labor relations. Sakrete of Northern California, supra at 905, fn. 4.
See also Radio & Television Broadcast Technicians, supra, 380 U.S. at 256, 85 S.Ct. 876; Local No. 627, International Union of Operating Engineers, AFL-CIO v. National Labor Relations Board, 518 F.2d 1040 (D.C. App.1975), app. filed, 44 U.S.L.W. 3502 (1976); Cowles Communications, Inc., 170 N.L.R.B. 1956 (1968); National Labor Relations Board v. Greyhound Corporation, 368 F.2d 778 (5th Cir. 1966); Miami Newspaper Pressmen's Local No. 46 v. National Labor Relations Board, 116 U.S.App.D.C. 192, 322 F.2d 405 (1963); Bachman Machine Company v. National Labor Relations Board, 266 F.2d 599 (8th Cir. 1959).
The evidence was clear that there was no centralized control of labor relations. DAS handled its own labor relations, entered into negotiations and concluded its own agreements, without the involvement of Sears. Furthermore there was no common ownership or financial control. See Hychem Constructors, Inc., 169 N.L.R.B. 274 (1968); Space Services International Corporation, 156 N.L.R.B. 1227 (1966); Westinghouse Electric Corporation, 163 N.L.R.B. 914 (1967) (all indicating that the existence of a cost-plus pricing arrangement does not indicate a co-employer status). The Court further concludes that the evidence fails to establish common management and interrelation of operations. The fact that DAS employees wore Sears patches, greeted customers with "Sears Calling" and left Sears "Not-Home" tags is not persuasive. The customers had called Sears seeking repairs for their appliances. These customers could not possibly know of the arrangements between Sears and DAS, nor would the customers be likely to open their doors to DAS servicemen after calling Sears. Accordingly, the Court concludes that Sears and DAS were not co-employers of plaintiffs herein.
Plaintiffs have failed to argue that Sears was a successor employer. In John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) the Court held that under certain circumstances a successor employer might be required to arbitrate with the union under the agreement entered into by the employer's predecessor. Crucial to the determination of whether the duty to arbitrate survives is whether there is "any substantial continuity of identity in the business enterprise before and after a change . . .". Id. at 551, 84 S.Ct. at 915. See also National Labor Relations Board v. Wayne Convalescent Center, Inc., 465 F.2d 1039 (6th Cir. 1972) (". . . the hiring of a large portion of the predecessor's employees is persuasive in finding a successor status.") National Labor Relations Board v. Interstate 65 Corporation, 453 F.2d 269 (6th Cir. 1971) (court ". . . must look to all the circumstances accompanying the transfer to determine whether the nature of the employing industry has undergone such a basic change that the collective bargaining unit . . . is no longer appropriate"). The factors to be considered in reaching such a determination include:
(1) whether there has been a substantial continuity of the same business operations;
(2) whether the new employer uses the same plant;
(3) whether he has the same or substantially the same work force;
(4) whether the same jobs exist under the same working conditions;
(5) whether he employs the same supervisors;
(6) whether he uses the same machinery, equipment, and methods of production; and
(7) whether he manufactures the same product or offers the same services. Morris, supra at 368-69.
The evidence establishes that Sears was in fact a successor employer. When viewed from the employees' position, General *798 Teamsters, Chauffeurs and Helpers, Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956 (3rd Cir. 1974), there was substantial continuity of operations. The services rendered, the work force, and the equipment used remained substantially the same. While there were necessarily some changes, the Court concludes that these were insufficient to overcome the conclusion that Sears was a successor employer.
Nonetheless, this status does not mean that Sears was bound to the substantive provisions of the collective bargaining agreement entered into by DAS and Local 610. The duty imposed upon the successor employer is the duty to bargain or to arbitrate with the existing union. National Labor Relations Board v. Burns International Security Services, Inc., 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); John Wiley & Sons, Inc., supra.
In John Wiley & Sons, Inc., supra, the Court noted that "a union might abandon its right to arbitration [with the successor] by failing to make its claims known . . .". Accordingly, the Court concludes that Sears can not be held at fault for failing to arbitrate with Local 610, absent a demand for the same by the union. The evidence established herein indicates that Local 610 did not request that Sears arbitrate under the DAS-Local 610 agreement. The Court must therefore conclude that the right to insist on arbitration has been abandoned. Plaintiffs, as members of the union, can not insist that this action be taken. See Brown v. Sterling Aluminum Products Corporation, 365 F.2d 651 (8th Cir. 1966), cert. denied, 386 U.S. 957, 87 S.Ct. 1023, 18 L.Ed.2d 105 (1967) holding that
. . . whenever the right sought to be enforced is not uniquely personal to the individual but is a right possessed by the bargaining unit as a whole, only the Union as the sole representative of that unit would normally have the standing to enforce the right. Thus the individual would have no standing to compel discussion of broad collective bargaining principles such as the re-negotiation of a new contract . . . Id. at 657.
Were plaintiffs to urge that they have suffered damages as a result of Local 610's failure to request arbitration, thus "abandoning" them to Local 688, the Court would be compelled to conclude that § 301 jurisdiction would be lacking. In Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); the Court noted that jurisdiction existed under § 301 to determine alleged "union interference with rights conferred on individual employees by the employer's promises in the collective-bargaining agreement, where it is proved that such interference constituted a breach of the duty of fair representation." Id. at 298-99, 91 S.Ct. at 1924. The Court further noted that a breach of the duty of fair representation must be supported by proof of arbitrary or bad-faith conduct, evidence of fraud, deceitful action or dishonest conduct.
In Gainey v. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, 313 F.2d 318 (3rd Cir. 1963), the court categorized unfair representation suits as follows:
(1) racial discrimination . . .; (2) involving the arbitrary sacrifice of a group of employees' rights in favor of another stronger or more politically favored group, often in direct violation of established union practice . . . and (3) discriminatory measures taken against an individual which sacrificed his rights for hostile and improper reasons. Id. at 324.
Clearly, the facts presented in this suit fail to fall within one of these categories. Evidence of bad faith, deceit, dishonesty, fraud or arbitrary conduct is completely lacking herein. At best it could be said that Local 610 acted erroneously in concluding that there was nothing to arbitrate once DAS closed its business. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231, 44 U.S.L.W. 4299 (1976) holding that "mere errors in judgment" are insufficient to support a claim of *799 breach of the duty of fair representation. Obviously Local 688 could not have breached its duty of fair representation, since it was not plaintiffs' bargaining representative when DAS ended its business.
In Lockridge, supra, the Court noted that The legislative determination that courts are fully competent to resolve labor relations disputes through focusing on the terms of a collective-bargaining agreement cannot be said to sweep within it the same conclusion with regard to the terms of union-employee contracts that are said to be implied in law. That is why the principle of Smith v. Evening News [371 U.S. 195 [83 S.Ct. 267, 9 L.Ed.2d 246] (1962)] is applicable only to those disputes that are governed by the terms of the collective-bargaining agreement itself.
The Court's conclusion therein was that where the conduct involved was arguably protected by § 7, or prohibited by § 8, of the National Labor Relations Act, 29 U.S.C. §§ 157 and 158, the doctrine of pre-emption precluded § 301 jurisdiction.
Section 7 provides that
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .
Section 8(b) of the Act provides, in part, that
It shall be an unfair labor practice for a labor organization or its agents 
(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 [section 7 above] of this title . . .
. . . . .
(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees . . .
Local 610's failure to request arbitration with Sears in accordance with John Wiley & Sons, supra, was arguably a refusal to bargain collectively with an employer. Plaintiffs' claims that Local 610 abandoned them in favor of Local 688 are arguably an attempt to coerce. Accordingly the Court lacks jurisdiction over such claims.
The Court has concluded that while jurisdiction may conceivably exist over plaintiffs' claims that DAS and Sears were co-employers, the evidence presented failed to establish the existence of a co-employer status. The Court has further concluded that jurisdiction is lacking to determine the allegations of conspiracy. Although not argued by plaintiffs, the Court has considered the question of Sears' status as a successor employer. While finding that the facts established that Sears was a successor employer, the Court has concluded that Local 610's failure to assert the right to arbitration waived that right. The Court has further concluded that plaintiffs, as union members, can not compel this arbitration, a request which plaintiffs have not made herein, and that jurisdiction is lacking to determine whether plaintiffs have suffered any damages as a result of Local 610's failure to request arbitration. Accordingly, judgment will be entered for defendants.