**MIAMI NEWSPAPER PRESSMEN'S LOCAL NO. 46, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17416.

United States Court of Appeals District of Columbia Circuit.

Argued May 28, 1963.

Decided June 27, 1963.

---

4. See Walling v. James V. Reuter Co., 321 U.S. 671, 64 S.Ct. 826, 88 L.Ed. 1001 (1944).

Mr. John S. McLellan, Kingsport, Tenn., of the bar of the Supreme Court of Tennessee, pro hac vice, by special leave of court, with whom Messrs. Neal Rutledge, Miami, Fla., Herbert S. Thatcher and David S. Barr, Washington, D. C., were on the brief, for petitioner.

Mr. Warren M. Davison, Attorney, National Labor Relations Board, with whom Messrs. Stuart Rothman, General Counsel, National Labor Relations Board at the time the brief was filed, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Gary Green, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. Edward L. Weber, Detroit, Mich., filed a brief on behalf of Knight Newspapers, Inc., as *amicus curiae*, urging enforcement of the Respondent's order.

Before WILBUR K. MILLER, FAHY and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

Before us for review at the instance of Miami Newpaper Pressmen's Local No. 46 is an order of the National Labor Relations Board directing it to abstain from certain conduct found to be in violation of Section 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act.[1] These statutory provisions reflect the congressional purpose to prevent strikes from spreading beyond the primary employer; and the issue here is whether

[1] 61 Stat. 140 (1947), as amended, 73 Stat. 542 (1959), 29 U.S.C. § 158(b):

"(b) It shall be an unfair labor practice for a labor organization or its agents — * * *

"(4) (i) to engage in, or to induce or encourage any *individual employed by any person engaged in commerce or in an industry affecting commerce* to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is— * * *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * * *".

the seemingly secondary employer was such in fact. The Board has found that it was. We sustain the order, and grant the Board's request for its enforcement.

## I

In 1961 the Union was negotiating a now collective bargaining agreement with the Miami Herald Publishing Company, a Florida corporation which publishes a daily newspaper, the Miami Herald. There was a failure to reach agreement, apparently over the terms of the manning arrangements in respect of new presses being installed as part of a major expansion program. Picketing began August 1, 1961, but the Herald was able to continue publishing. The Union thereupon, on August 19, 1961, picketed another newspaper in another city—the Detroit Free Press, in Detroit, Michigan, causing the employees of the Free Press to leave their work, and resulting in a complete shut-down until August 24, when an injunction was issued by a federal court in Detroit at the behest of the Board's Regional Director. The suspension of publication forced the Free Press to discontinue its purchases, averaging $25,000 per day, of newsprint and ink from nonaffiliated suppliers.

Knight Newspapers, Inc., an Ohio corporation which publishes the Free Press, filed charges of unfair labor practices with the Board and, on August 29, 1961, a complaint issued. Hearings were held before a Trial Examiner, whose findings and recommendations were adopted by the Board.

The facts found with respect to the inter-corporate relationships of the Free Press and the Herald may be summarized as follows: Knight Newspapers, Inc., owns all the stock of the Florida corporation which publishes the Herald.[2] The stock of Knight is owned by three individuals, James, John, and Clara Knight. James Knight is the general manager of the Herald and for 25 years has exercised authority over all aspects of its operations, including labor relations. Henry Weidler for 20 years has performed a similar function for the Free Press. The two corporations have a number of common officers and directors, as witness the fact that John Knight is president and a director of both, and Clara and James Knight serve on both boards as directors. The Herald and the Free Press each annually make certain purchases of services from the other, but these are not so substantial as to indicate any degree of mutual dependence.[3] Of the 1700 employees of the Free Press and 1200 of the Herald, only two individuals are shown to have worked for both at different times.[4]

In the field of labor relations, the pattern of independence persists. Primary responsibility in this area is vested in, and exercised by, James Knight for the Herald and by Henry Weidler for the Free Press, and there is no coordination of policy between them. Each pa-

2. It also owns the greater part of the stock of Knight Publishing Company, a Delaware corporation which publishes two papers in Charlotte, North Carolina; and of Beacon Journal Publishing Company, an Ohio corporation which publishes a paper in Akron, Ohio, the place where Knight has its principal offices. Under the Union's theory, each of these papers was as legally vulnerable to secondary pressure as was the Free Press.

3. The record showed no centralized purchasing policies or machinery. Knight Newspapers, Inc., owned all the stock of Portage Newspaper Supply Corporation, an Ohio corporation engaged in the business of selling newspaper printing equipment and supplies. The Herald bought from 1 to 2% of its requirements from Portage, and the Free Press from 1 to 1½%. Neither was required to make any such purchases, and the terms to them were the same as those on which Portage sold to 45 papers outside the Knight chain.

4. These were editors who moved up to more responsible jobs. It is significant that of 20 pressmen hired by the Herald after it was struck, none came from the Free Press or any other Knight paper, except three who came from Charlotte. Although the Herald gave credit under its pension plan to non-supervisory employees for service on other Knight papers, the Free Press did not even have a retirement system for such employees.

per has its own collective bargaining agreements. The 1961 negotiations between the Union and the Herald were conducted in the first instance by Arthur Gucker, the business manager of the Herald, who was assigned to this task by James Knight. Throughout these negotiations, James Knight and Gucker consulted no one but their subordinates with respect to the formulation of the management position.[5] In the case of the Free Press, Weidler has for many years caused it to engage in joint bargaining through the Detroit Newspaper Publishers Association, which is made up of all of Detroit's major newspapers. No instructions have ever been issued by John Knight, or by Knight Newspapers, Inc., with respect to the labor policies to be followed by either the Free Press or the Herald.

## II

The principal issue presented by the Union to us upon this review turns upon the conclusions to be drawn from the foregoing facts. It is asserted that Knight Newspapers, Inc., is not a truly neutral or unallied employer within the meaning of the statute. The Union points first to the circumstance of common ownership. This, of course, appears clearly from the record. But both the Board [6] and the courts [7] have consistently and repeatedly held that common ownership alone does not suffice for this pur-

5. The Union relied heavily upon the activities of one Leslie Griner as establishing common control of labor relations. As vice-president of Knight Newspapers, Inc., Griner's specialty was the selection and installation of mechanical facilities. He was assigned to assist the Herald on this aspect of its $30,000,000 expansion program, and the dispute in question grew out of the manning policies proposed for the new presses installed under Griner's supervision. But the Board found that Griner was a mechanical specialist, not a labor relations expert, and his mission in Miami was in the former role. During a brief vacation that Gucker took during the course of the negotiations with the Union, Griner sat in for him in meetings with the Union but only under binding instructions from Gucker as to the positions already formulated by the Herald's management. The Board found—with reason, we think—that, insofar as labor relations were concerned, Griner "carried out, rather than shaped, policy in this regard."

6. 'The Union points to the use by the Board on occasion of the disjunctive phrase, "commonly owned or controlled." United Steelworkers (TCI), 127 N.L.R.B. 823, 824 (1960); General Drivers, etc. (Ada Transit Mix), 130 N.L.R.B. 788, 794 (1961); and Local 810, Teamsters (Fein Can Corp. and Advance Trucking Corp.), 131 N.L.R.B. 59, 70 (1961). But the Trial Examiner appears correctly to have regarded this as inadvertent, as in none of these cases did the existence of common ownership deprive the secondary employer of its neutral status. In many other cases the Board has stated the tests in conjunctive terms, i. e., "commonly owned *and* controlled." National Union of Marine Cooks (Irwin-Lyons Lumber Co.), 87 N.L.R.B. 54, 56 (1949); United Brotherhood of Carpenters (J. G. Roy and Sons Co.), 118 N.L.R.B. 286, 287–88 (1957); Warehouse & Distribution Workers Union (Bachman Machine Co.), 121 N.L.R.B. 1229, 1234 (1958); Amalgamated Lithographers of America (Miami Post Co.), 130 N.L.R.B. 968, 973 (1961); and Local 282, Teamsters (Acme Concrete & Supply Corp.), 137 N.L.R.B. No. 137, p. 3, 50 L.R.R.M. 1374, 1375 (1962).

7. J. G. Roy & Sons Co. v. NLRB, 251 F.2d 771 (1st Cir.1958); and Bachman Machine Co. v. NLRB, 266 F.2d 599 (8th Cir.1959). In each of these cases the Court of Appeals set aside the Board's order, but only because it disagreed with the Board's inference of common control from the facts of record. There was complete acceptance of the Board's test of common ownership *and* control as the proper standard to be applied. The Fifth Circuit, alluding to the Roy and Bachman cases, has most recently formulated the test in these terms:

"The Board emphasized that centralized control of labor relations is a factor to be considered in finding common control of separate entities. To this we might add other factors, for example, common management, integrated operations and complete dependence of one company upon the other for its work. Suffice it to say however that in all events the single employer exception to the secondary boycott proscription runs only to those situations where because of conditions existing the two employers may and should be considered as one."

pose. There must be something more in the form of common control, as it is usually phrased, denoting an actual, as distinct from merely a potential, integration of operations and management policies. Two business enterprises, although commonly owned, do not for that reason alone become so allied with each other as to lift the congressional ban upon the extension of labor strife from the one to the other.

Although the Union argues that common ownership alone is sufficient to justify its bringing the Free Press within the orbit of its legitimate strike pressure, it does not—as it cannot—rest, in the last analysis, on this claim. It asserts that the facts as found by the Board disclose what it calls "common management," so sweeping in scope as to warrant the direction of the Union's force against the Free Press for the purpose of forcing the Herald to accede to its demands.

■ We think, however, that the Board has clearly found the facts to the contrary, and that the inference it has drawn from those facts of a lack of common control is fully justified. Congress has committed this function to the Board in the first instance as the expert body created by it to deal with these matters. Our function is a more limited one. We are not to overturn the Board's findings and conclusions in this regard if they are based upon substantial evidence in the record as a whole and have "a reasonable basis in law." NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S. Ct. 851, 860, 88 L.Ed. 1170 (1944). From our reading of the record, this is not a proper occasion for judicial correction.

These two metropolitan daily newspapers appear to have had separate and largely unrelated lives of their own, despite their common ownership. Published hundreds of miles apart in two distinctive urban communities of the United States, each paper went its way under independent direction supplied locally, as they must have done in order to be successfully responsive to the varying needs of their two unrelated readerships. A newspaper reflects in significant measure the peculiar personality of its locale. To the extent that it does so in fact, its commercial success is to that degree correspondingly assured. Wise publishers know this to be true and shape their arrangements and policies accordingly. This appears to be the case here.

■ In originally enacting the statute here involved, Congress sought to confine labor strife to the employer immediately involved. It made a legislative judgment that it was not in the public interest for one business enterprise to be halted because of the unrelated problems of another.[8] Only when the two businesses were in fact one was there to be any breaching of this barrier. The allied employer doctrine, necessitating actual common control in addition to common ownership, followed closely upon the heels of the first formulation of congressional policy in this field. This gloss upon the statute was fully familiar to the Congress when, in the 1959 amendments to the Act, it addressed itself again to the area of the regulation of labor relations. The legislative record shows that the changes then made were expressly without purpose to alter the "common control" approach.[9] We believe that, in the action it has taken here, the

Employing Lithographers of Greater Miami v. NLRB, 301 F.2d 20, 29 (5th Cir. 1962).

8. The Supreme Court has characterized these provisions of the Act as directed to the achievement of "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pres-

sures in controversies not their own." NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

9. In the House debates in August, 1959, both Representatives Landrum and Griffin said that the proposed changes in the secondary boycott provisions of the law "would in no way affect the existing law concerning the allied employer doctrine." II Legislative History of the Labor-Man-

Board was well within the range of the power entrusted to it to effectuate the congressional intent.

### III

The Union's second contention is that, since the statutory prohibition upon secondary picketing is made to depend upon the object specified in the statute, the Board's order must fall because the requisite purpose has not been shown. The statutory language is that the "object" is the "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of *any other* producer, processor, or manufacturer, *or to cease doing business with any other person * * *.*" (Emphasis added). The Union argues that this means interference with the business relationships between the primary and secondary employers only. It characterizes these relationships on this record as *de minimis*, and thus concludes that the unlawful object required by the statute has not been made out.[10]

The Board did not accept this characterization of the purely business dealings between the Herald and the Free Press, inasmuch as the record showed that, in the seven months preceding the strike, the Free Press had bought approximately $3,800 worth of photographs and stories from the Herald. In any event, however, it did not find it necessary to rest upon these facts, because the record did show that the Free Press was obliged to suspend its substantial daily purchases of materials and supplies in interstate commerce from other persons. It points to the precise statutory language—"any other"—and insists that there is no limitation of this object to dealings with the primary employer.

■ We agree with the Board's reading of the statute. Although it is frequently true that the object of secondary picketing is to obstruct dealings with the primary employer, Congress did not so limit its language. And a moment's reflection establishes that such a limitation would not have been consonant with the central legislative purpose. That purpose was to confine labor conflicts to the employer in whose labor relations the conflict had arisen, and to wall off the pressures generated by that conflict from unallied employers. If one of the latter could with impunity be forced to suspend its business relations with all persons other than the primary employer, the evil which Congress sought to get at would be complete. Many secondary employers would have no occasion to have commercial intercourse with the primary employers. Is it to be supposed that Congress intended that their businesses could be stopped by secondary pressures simply because of this circumstance? We think not, and uphold the Board's conclusion that the statutory object was shown on the record to be present.[11]

The Union's petition to set aside the order is denied. The Board's cross-petition for enforcement is granted.

agement Reporting and Disclosure Act of 1959 (G.P.O.1959), p. 1681. And see H.R.Rep.No.1147, 86th Cong., 1st Sess. 38 (1959), U. S. Code Congressional and Administrative News, p. 2318; Koretz, Federal Regulation of Secondary Strikes and Boycotts—A Third Chapter, 13 Syracuse L.Rev. 1, 3 (1961); and, The Landrum-Griffin Amendments: Labor's Use of the Secondary Boycott, 45 Cornell L.Q. 724, 758 n. 158 (1960).

10. This formulation emerged more clearly upon oral argument. As the point was made in the Union's brief, it was cast more as a renewal of the claim that the Herald and the Free Press were identical employers and that, accordingly, there could logically be no object to force the same employer to stop doing business with himself.

11. See Local 450, International Union of Operating Engineers v. Elliott, 256 F.2d 630 (5th Cir.1958); Retail Fruit & Vegetable Clerks v. NLRB, 249 F.2d 591 (9th Cir.1957); International Bhd. of Electrical Workers v. NLRB, 181 F.2d 34 (2d Cir.1950).