**BOTANY INDUSTRIES, INC.,**
Plaintiff,

v.

**NEW YORK JOINT BOARD, AMALGA-MATED CLOTHING WORKERS OF AMERICA,** Defendant.

**No. 71 Civ. 2381 (DNE).**

United States District Court,
S. D. New York,
Civil Division.
April 12, 1974.

Weil, Gotshal & Manges, New York City (Carl A. Schwarz, Jr., New York City, of counsel), for plaintiff.

Jacob Sheinkman, New York City New York City, and Robert Bach, of counsel), for defendant.

## OPINION

EDELSTEIN, Chief Judge:

This is an action in which plaintiff employer seeks to vacate a labor arbitration award and defendant union seeks to confirm and to enforce the award.

The relevant facts, which are not in dispute, are as follows. In 1963, plaintiff Botany Industries, Inc. (hereinafter referred to as "Botany") licensed Levinsohn Bros. & Co., Inc. (hereinafter referred to as "Levinsohn") to manufacture and sell boys', students' and junior clothing; and to use the trademark "Botany" on the manufactured clothing. At the time the licensing agreement was entered into, Levinsohn had a collective bargaining agreement with defendant New York Joint Board, Amalgamated Clothing Workers of America (hereinafter referred to as "Joint Board"). In

1966, Botany acquired all of the shares of Levinsohn and began operating it as a wholly-owned subsidiary, albeit as a separate corporation. The acquired corporation continued to be known as Levinsohn Bros. & Co., Inc. On November 1, 1966, in conjunction with the acquisition of Levinsohn stock, Botany entered into an agreement with the Joint Board which provided, *inter alia:*

1. Botany agrees to continue to manufacture boys', students' and junior clothing in a manufacturing facility operated by Botany or on its behalf, by its own subsidiary, or by a company owned or controlled by it pursuant to the terms of a collective bargaining agreement with the union.

2. Botany further agrees that any and all boys', students' and junior clothing manufactured for and on its behalf shall only be manufactured in production facilities which are in contractual relations with the union, and that Botany will not cause, directly or indirectly, any of such boys', students' and junior clothing to be manufactured in any other production facility which is not in contractual relations with the union without first obtaining the prior written consent of the Union.

Paragraph 3 of the Agreement further provides, in pertinent part, that "Any controversy or claim arising out of or relating, directly or indirectly, to the provisions of this Agreement, or the interpretation and performance thereof, shall be settled by arbitration." This Agreement was to remain in effect until June 1, 1981.

In December 1971, based upon a report that Botany intended to close down the Levinsohn operation, the Joint Board requested a hearing before an arbitrator for the purpose of determining the rights and obligations of the parties under the 1966 Agreement which, the arbitrator noted, was "in effect an application for a declaratory judgment." Although Botany questioned the reasons for the hearing,[1] it agreed to attend. After devoting two days to a hearing of the matter, Arbitrator Herman Gray rendered an award in favor of the Joint Board. The essence of the award, the text of which is reprinted in the margin,[2] is that (1) Botany agreed that

---

[1.] *See* letter of January 5, 1971 from plaintiff's attorneys to Arbitrator Gray, Exhibit 5, Notice of Motion, 71 Civ. 2381 (S.D.N.Y. May 27, 1971).

[2.] The award of Arbitrator Gray is as follows:

1. Under date of November 1st, 1966 Botany Industries, Inc. entered into a written agreement with the New York Joint Board of the Amalgamated Clothing Workers of America, which agreement was in full force and effect at all of the times herein mentioned and is to continue so in force and effect until termination date, to wit, June 1st, 1981;

2. By the terms of the aforesaid agreement Botany agreed not to engage in the manufacture of boys', students', or Junior clothing, either directly in a manufacturing facility owned and operated by itself, or in a manufacturing facility owned or operated by one of its subsidiaries or by any other company which it either owns or controls, or indirectly in any other form, unless such manufacturing facility operates under collective agreement with the Joint Board, that is, among other things,

it is physically located within the geographic jurisdiction of the Joint Board.

3. By the terms of the aforesaid agreement Botany further agreed that the word "Botany" would be used in connection with the manufacture, sale or other disposition of boys', students', or Junior clothing only if such clothing were manufactured in a manufacturing facility owned and operated by itself, or by one of its subsidiaries, or by another company which it either owns or controls, and which said manufacturing facility was being operated under the terms of a collective agreement with the Joint Board;

4. Botany should be and it hereby is directed not to sell or license and not to agree to sell or license the word "Botany" or any symbol or mark which contains this word for use in connection with the manufacture, sale or other disposition of any boys', students' or Junior clothing which is not being manufactured or has not been manufactured in a manufacturing facility owned and operated by Botany or by one of its subsidiaries, or by another company which it owns or controls, and which manufacturing facility was or is operated un-

it would continue to manufacture boys', students' and junior clothing in a manufacturing facility owned or controlled by Botany, by a subsidiary of Botany, or by a company owned or controlled by Botany until June 1, 1981; (2) Botany agreed that the above described clothing would only be manufactured in a manufacturing facility operated under a collective agreement with, and under the geographic jurisdiction of, the Joint Board; and (3) Botany agreed that the trademark "Botany" would be used on the above described clothing only if the clothing was manufactured in a facility operated under a collective agreement with the Joint Board. The arbitrator also forbade Botany from licensing or selling the trademark "Botany" for use in connection with the manufacture, sale or other disposition of the above described clothing unless the sale is to, or the license is with, a facility operated under a collective agreement with the Joint Board.

Botany attacks the arbitration award on two levels. Its main argument is that paragraphs 1 and 2 of the 1966 Agreement constitute an illegal "hot cargo" provision within the meaning of section 8(e) of the Labor Management Relations Act of 1947, 29 U.S.C. § 158(e) [hereinafter referred to as "L.M.R.A."], as amended by the Labor-Management Reporting and Disclosure Act of 1959 [hereinafter referred to as "L.M.R. D.A."]; that the Agreement cannot be enforced; that any attempt by the arbitrator to force compliance with these illegal provisions, thereby requiring the commission of an unlawful act, is in excess of the arbitrator's power; and that the award, therefore, cannot be enforced and must be vacated.[3] Botany's second line of attack involves the arbitrator's interpretation and construction of the agreement. Succinctly stated, Botany contends that the portion of the arbitrator's award restricting the licensing of the "Botany" trademark is not founded upon the agreement; and, therefore, the granting of such an award is in excess of the arbitrator's power.

The Joint Board, on the other hand, maintains that the arbitrator properly construed the 1966 Agreement and that the award, therefore, is not subject to judicial review. However, should the court decide to review the arbitrator's award, the Joint Board contends that the Agreement does not fall within the strictures of section 8(e). In the alternative the Joint Board argues that even if the language of the Agreement does constitute an illegal "hot cargo" provision, the Agreement is saved by the so-called "garment industry exemption" contained in section 8(e).

## JURISDICTION AND SCOPE OF REVIEW

The parties have moved to invoke the remedies available to them under the Arbitration Act, 9 U.S.C. §§ 1 et seq.: plaintiff seeks to have the award of Arbitrator Gray vacated pursuant to 9 U.S.C. § 10; and defendant seeks to have the award of Arbitrator Gray con-

der the terms of a collective agreement with the Joint Board; and Botany is further directed not to permit or to agree to permit the use of the word "Botany" in any other way whatsoever in connection with clothing of the kinds hereinabove named unless such clothing has been or is being manufactured in a manufacturing facility as hereinabove described;

5. By the terms of the aforesaid agreement Botany further agreed during the effective term of the agreement, to wit until June 1st, 1981, to continue to manufacture boys', students', and Junior clothing in a manufacturing facility owned or controlled by it, or on its behalf by its own subsidia-

ry or by a company owned or controlled by it, which facility is operated under collective agreement with the Joint Board. In re Botany Industries, Inc. (New York, February 23, 1971) at 9–10 [unpublished arbitration award annexed as Exhibit 6 to Notice of Motion, 71 Civ. 2381 (DNE) (S. D.N.Y. May 27, 1971)] [hereinafter referred to as In re Botany Industries].

3. Botany raised this contention during the course of the arbitration proceedings. The arbitrator, however, refused to entertain Botany's contention, claiming that he did not have the power to administer the Labor Act. In re Botany Industries, *supra*, n. 2, at 7–8.

firmed, and enforced, pursuant to 9 U. S.C. § 9. Jurisdiction is predicated upon section 301(a) of the L.M.R.A., 29 U.S.C. § 185(a).

The first problem to be considered is the proper role of the court in reviewing an arbitration award in the context of cross motions to confirm and to vacate the award. The Joint Board contends that the arbitrator properly construed the collective bargaining agreement; that, based upon the teachings of United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960), one of the *Steelworker's* Trilogy,[4] the award is not subject to judicial review; and that the award should therefore be enforced. Botany, however, in its primary challenge to the award's validity, does not take issue with the arbitrator's construction or interpretation of the agreement. Instead, Botany maintains that the agreement violates section 8(e) of the L.M.R.A.; that the agreement is therefore void and unenforceable; that any attempt by the arbitrator to enforce a void and unenforceable agreement constitutes an excess of his authority; and that the award cannot be enforced and must be vacated.

Defendant's reliance upon the *Enterprise* decision for the proposition that a proper construction of a collective bargaining agreement by an arbitrator precludes judicial review is somewhat misplaced. To be sure, the Supreme Court did limit a court's review of the merits of an arbitration award by enunciating a national policy favoring the settlement of labor disputes by arbitration; and by indicating that reviewing courts, in keeping with this national policy, should be guided by the concept of judicial restraint so as not to undermine the arbitral process. However, a brief examination of the *Enterprise* case should make apparent the fact that the restrictions and guidelines the Supreme Court imposed upon reviewing courts are not applicable to the controversy before this court. In *Enterprise,* the employer refused to comply with the arbitrator's award. The union sought, and obtained, enforcement of the award in the district court. The court of appeals, to a limited extent, agreed with the district court; but, instead of enforcing the arbitrator's award, it fashioned its own award which significantly modified the arbitrator's award. The Supreme Court reversed the judgment of the court of appeals and sustained the district court's enforcement of the award,[5] stating that "[t]he refusal of courts to review *the merits* of an arbitration award is the proper approach to arbitration under collective bargaining agreements." 363 U.S. at 596, 80 S.Ct. at 1360 (emphasis added). In so ruling, the Supreme Court found that the basis for the court of appeals' decision was not that the arbitrator had exceeded his authority by failing to draw his award from the essence of the agreement, which would be a proper reason for refusing enforcement, but rather, that the court of appeals "merely disagreed with the arbitrator's construction of [the award]." 363 U.S. at 598, 80 S. Ct. at 1361. The Supreme Court specifically rejected the attempt by the court of appeals to substitute its own judgment and interpretation of the agreement for that of the arbitrator, stating:

> the question of interpretation of the collective bargaining agreement is a

---

4. In 1960, the Supreme Court decided three cases involving the function of courts vis-a-vis the arbitration process. These cases, commonly referred to as the *Steelworker's* Trilogy, are United Steelworkers of America v. Am. Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

5. The Supreme Court, however, modified the judgment of the district court to the extent it was necessary to correct an ambiguity in the arbitrator's award. The arbitrator had ordered that certain employees should be reinstated with back pay, but neglected to determine the amounts due the employees. The Supreme Court directed that this determination should be made by the arbitrator.

question for the arbitrator. It is the arbitrator's construction which was bargained for; and *so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.*

363 U.S. at 599, 80 S.Ct. at 1362 (emphasis added).

■ Enterprise is clearly distinguishable from the case at bar. *Enterprise* involves only one of several grounds for vacating an arbitration award [6]—an attack upon the arbitrator's judgment— and its pronouncements are directed to that specific ground. Thus, the Supreme Court was concerned with the review of the *merits* of an arbitrator's award; and it was concerned with the *interpretation and construction of the* collective bargaining agreement. Indeed, the essence of the Court's decision is that an agreement between parties is susceptible to many different interpretations and constructions; and it is the arbitrator's interpretation and construction of the agreement, not a reviewing tribunal's interpretation and construction of the agreement, which should govern the parties' relationship. In the instant case, however, the nature of the attack is quite different—the award is challenged, not upon its merits, but upon the ground that the underlying agreement violates a federal law and therefore is unenforceable—and thus the nature of the court's inquiry is also quite different. This court is *not* concerned with whether the arbitrator has properly construed the collective bargaining agreement, or whether this court agrees with the arbitrator's interpretation of the agreement; but, rather, this court is concerned with whether the collective bargaining agreement and, *a fortiori,* the arbitration award is capable of being enforced. Indeed, as one court has aptly stated, the court "is actually concerned with the *lawfulness of its enforcing* the award and not with the *correctness of the arbitrator's* decision." Local 985, UAW v. W. M. Chace Co., 262 F.Supp. 114, 117 (E.D.Mich.1966) (emphasis in original).

Consequently, the court's ability to review the arbitration award presently before it is not constrained by the specific *Enterprise* guidelines. However, the question still to be answered, in light of the broader national policy favoring the final settlement of labor disputes by arbitration, is whether a court should review an arbitration award which is attacked upon the theory that the underlying agreement, which the award seeks to enforce, violates the federal labor laws. This court believes that the answer should be in the affirmative.

■ A fundamental rule of law is that a contract made in violation of a statute is void, Ewert v. Bluejacket, 259 U.S. 129, 138, 42 S.Ct. 442, 66 L.Ed. 858 (1922); Waskey v. Hammer, 223 U.S. 85, 94, 32 S.Ct. 187, 56 L.Ed. 359 (1912); Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 548, 22 S.Ct. 431, 46 L.Ed. 679 (1902); and unenforceable, Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). As the Supreme Court stated in *Hurd,*

The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable

---

6. An award may be vacated on the grounds that there was fraud, partiality or other misconduct on the part of the arbitrator (e. g. Commonwealth Castings Corp. v. Continental Coatings Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)); that the award was based upon manifest disregard of the law (e. g. Trafalgar Shipping Co. v. Int'l Milling Co., 401 F.2d 568 (2nd Cir. 1968); Saxis S.S. Co. v. Multifacs Int'l Traders, Inc., 375 F.2d 577 (2nd Cir. 1967)); or that the award violates public policy (e. g. Electrical, Radio & Machine Workers–Local 453 v. Otis Elevator Co., 314 F.2d 25 (2nd Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963); Glendale Mfg. Co. v. Int'l Ladies' Garment Workers', Local 520, 283 F.2d 936 (4th Cir. 1960)).

legal precedents. Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.

334 U.S. at 34–35, 68 S.Ct. at 853 (footnotes omitted). Here, the "private agreement" is between an employer and a labor organization; and the "public policy of the United States" is manifested in the federal labor laws.[7] The mere fact that the contract is denominated as a collective bargaining agreement and provides for arbitration as a method of settling labor disputes does not diminish the applicability of this general rule. E. g. Dewey v. Reynolds Metals Co., 300 F. Supp. 709, 713 (W.D.Mich.1969), rev'd on other grounds 429 F.2d 324 (6th Cir. 1970), aff'd by an equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). Indeed, where the validity of the collective bargaining agreement is questioned prior to arbitration, judicial relief is available by way of an action for declaratory judgment. Todd Shipyards Corp. v. Marine and Shipbuilding Workers, Local 39, 232 F.Supp. 589 (E. D.N.Y.1964), aff'd 344 F.2d 107 (2nd Cir. 1965); Coulon v. Carey Cadillac Renting Co., 231 F.Supp. 991 (S.D.N.Y. 1962). Cf. Black-Clawson Co., Inc. v. Int'l Ass'n of Machinists Lodge 355, 313 F.2d 179 (2nd Cir. 1962). It would make little sense to deny the parties access to the judicial process merely because the action to determine the validity and enforceability of the agreement is commenced after arbitration. If the agreement is void, it is not legitimatized by the arbitral process; and if the agreement is unenforceable, it is not rendered enforceable by an arbitrator's decision. Simply stated, the court cannot enforce an invalid collective bargaining agreement, either directly, in the context of an action for declaratory judgment, or indirectly, by enforcement of the award.

To hold otherwise would undermine the judicial, as well as arbitral, process. By failing to ascertain the enforceability of the agreement, the court would not only be disregarding the Supreme Court's mandate prohibiting the enforcement of agreements violative of public policy,[8] but it would also be placing itself in the untenable position of giving judicial sanction to an unlawful act by ordering the parties to engage in an activity proscribed by federal statutory law. This the court will not permit, for the court can neither ignore the law nor condone disobedience to the law's commands. Hodgson v. Chain Service Restaurant, Luncheonette and Soda Fountain Employees Union, Local 11, 355 F. Supp. 180 (S.D.N.Y.1973).

Moreover, an examination of the "applicable legal precedents" involving circumstances similar to the one presented here supports the concept of judicial review of arbitration awards challenged for being founded upon an unenforceable collective bargaining agreement. Thus,

---

7. The Second Circuit Court of Appeals, citing *Hurd*, has stated:

    It is no less true in suits brought under § 301 to enforce arbitration awards than in other lawsuits that the "power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States. * * *" Hurd v. Hodge, 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–853, 92 L.Ed. 1187 (1948). The public policy to be enforced is a part of the substantive principles of federal labor law which federal courts, under the mandate of Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972 (1957), are empowered to fashion.

Electrical, Radio & Machine Workers, Local 453 v. Otis Elevator Co., 314 F.2d 25, 29 (2nd Cir.), cert. denied, 373 U.S. 949, 83 S. Ct. 1680, 10 L.Ed.2d 705 (1963).

8. In Metal Product Workers, Local 1645 v. Torrington Co., 358 F.2d 103 (2nd Cir. 1966), the Second Circuit, quoting Electrical Radio & Machine Workers, Local 453 v. Otis Elevator Co., 314 F.2d 25, 29 (2nd Cir.) cert. denied, 373 U.S. 949, 80 S.Ct. 1358, 4 L.Ed.2d 1403 (1963), stated:

    "[W]hen public policy is sought to be interposed as a bar to enforcement of [or as a reason to vacate] an arbitration award, a court *must* evaluate its asserted content."

358 F.2d at 106 (emphasis added; brackets in original).

for example in Kreindler v. Clarise Sportswear Co., 184 F.Supp. 182 (S.D.N.Y.1960), an action to confirm and enforce an arbitration award, the court implicitly sanctioned review of arbitration awards which were attacked on the basis of the validity of the underlying agreement. Clarise contended that enforcement of the collective bargaining agreement would cause it to violate section 302(a) of the L.M.R.A. as amended, 29 U.S.C. § 186(a). The court, without articulating reasons for doing so, reviewed the validity of the agreement and determined that the agreement did not violate section 302(a). And, in International Ladies' Garment Workers' Union, Locals 234 & 243 v. Beauty Bilt Lingerie, Inc., 48 L.R.R.M. 2995 (S.D.N.Y. 1961), the court, again without explanation, ascertained the validity of a collective bargaining agreement in the context of a motion for summary judgment seeking to enforce and confirm an arbitration award.

Courts have also entertained actions in which the challenge is to the legality of the award, not the underlying agreement. In the instant case, it can be said that the parties are attacking the arbitration award as well as the underlying agreement, for, if the underlying agreement violates a positive law, the award seeking to enforce the agreement must necessarily violate the same law. Thus, in Glendale Mfg. Co. v. International Ladies' Garment Workers' Union, Local 520, 283 F.2d 936 (4th Cir. 1960), after the district court directed enforcement of the arbitrator's award without considering the legality of the award, the Fourth Circuit Court of Appeals, realizing that enforcement of the award might "affirmatively order the commission of an unfair labor practice," decided, sua sponte, to review the validity of the award. 283 F.2d at 938. After review, the court's fears were confirmed, and the district court's judgment was vacated. For similar judicial responses, see Local 985, UAW v. W. M. Chace Co., 262 F.Supp. 114 (E.D.Mich.1966) (allegation that award would cause the em-

ployer to violate Michigan statutory law); Puerto Rico District Council of United Bhd. of Carpenters & Joiners v. Ebanisteria Quintana, 56 L.R.R.M. 2391 (D.P.R.1964) (court held that arbitration decision to the extent it violated section 302(c)(4) of the L.M.R.A., 29 U.S.C. § 186(c)(4), was not to be enforced). See generally Griffin, "Judicial Review of Labor Arbitration Awards," 4 Suffolk L.Rev. 39, 62–67 (1969); Aaron, "Judicial Intervention in Labor Arbitration," 20 Stanford L. Rev. 41, 53–55 (1967).

Even Enterprise can be read as supporting, rather than inhibiting, review under these conditions. Although the Supreme Court urged courts to enforce arbitration awards without review when the merits of the award are challenged, to hold that this restriction should be extended to include situations in which the issue is the validity of the collective bargaining agreement would be inconsistent with the purpose sought to be accomplished by the Supreme Court. Plainly, it was the Court's desire to prevent the arbitral process from being undermined by excessive judicial interference with the merits of the award. However, if an agreement, banned by Congress were to be enforced by the courts, the entire structure upon which the arbitral process rests would be undermined, thereby thwarting the purpose of the Supreme Court.

Enterprise also buttresses the concept of reviewability to the extent that it not only does not prohibit judicial review, it requires review when the arbitrator's interpretation and construction of the agreement is not founded upon the agreement. Thus, the court declared:

> an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest

*an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*

363 U.S. at 597, 80 S.Ct. at 1361 (emphasis added). Surely, if review is permissible when an arbitrator transcends the boundaries of the agreement, review should be permitted when the agreement itself transcends the boundaries of the law.

Having decided that review of Arbitrator Gray's award is appropriate, it would appear as if the court's task is reduced to ascertaining the validity and enforceability of paragraphs 1 and 2 of the 1966 Agreement. However, because the alleged violation constitutes an unfair labor practice, one other procedural hurdle, one of minor dimensions, must be overcome before the substantive issues can be reached—namely, whether a district court, in the context of cross motions to vacate or to confirm an arbitration award, may determine if a particular activity constitutes an unfair labor practice; or whether the National Labor Relations Board (hereinafter referred to as the "N.L.R.B.") has exclusive jurisdiction to make such a determination. To state it differently, is the district court, in an action arising under section 301 of the L.M.R.A. precluded by the preemption doctrine from determining if a specified activity constitutes an unfair labor practice? This question has been answered by the Supreme Court in Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). There, the action was for breach of a collective bargaining agreement; the conduct involved was concededly an unfair labor practice within the jurisdiction of the N.L.R.B.; the suit was brought pursuant to section 301 of the L.M.R.A.; and the issue was the exclusiveness of the N.L.R.B.'s jurisdiction. The Supreme Court, in specifically rejecting the preemption doctrine, stated:

> The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.

371 U.S. at 197, 83 S.Ct. at 269. Shortly after *Smith* was handed down, the Second Circuit recognized the import of the decision, and asserted that "[t]he Supreme Court has all but sounded the death-knell of the theory of exclusive NLRB jurisdiction in cases arising under section 301 of the Labor-Management Relations Act." Carey v. General Electric Co., 315 F.2d 499, 508 (2nd Cir. 1963). The court reiterated this concept of concurrent jurisdiction between the courts and the N.L.R.B. in Todd Shipyards Corp. v. Marine and Shipbuilding Workers, Local 39, 344 F.2d 107 (2nd Cir. 1965) aff'g 232 F.Supp. 589 (E.D. N.Y.1964). In *Todd Shipyards*, plaintiff instituted an action for declaratory judgment under section 301 alleging that a provision of the collective bargaining agreement violated section 8(e) of the L.M.R.A. The district court, in finding that it had jurisdiction, declared that "[t]he fact that the resolution of the issue may also involve the determination of whether an unfair labor practice has been committed, will not deprive the court of jurisdiction." 232 F.Supp. at 591.

It should be noted that, prior to the demise of the preemption doctrine in suits brought under section 301, courts were not reluctant to exercise jurisdiction over those section 301 proceedings which would require courts, as a basis for resolving the contract dispute, to consider an unfair labor practice allegation. Glendale Mfg. Co. v. International Ladies' Garment Workers' Union, Local 520, 283 F.2d 936 (4th Cir. 1960) (determination of whether enforcement of arbitration award directing an employer to bargain with a union which did not represent the employees would require the commission of an unfair labor practice); Coulon v. Carey Cadillac Renting Co., 231 F.Supp. 991 (S.D.N.Y.1962) (declaratory judgment action to determine if clause of collective bargaining agreement violated section 8(e)).

In view of the foregoing, this court concludes that it has jurisdiction to determine the enforceability of Arbitrator Gray's award.

## HOT CARGO ISSUE

Section 8(e) states, in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer . . . agrees to . . . cease doing business with any other person, and any contract or agreement entered into . . . containing such an agreement shall be to such extent unenforcible and void . . . ."

The 1966 Agreement between Botany and the Joint Board forbids, except upon consent of the Joint Board, Botany from doing business with any other employer engaged in the production and manufacture of boys', students' and junior clothing. This proscription from doing business with other employers, according to Arbitrator Gray's interpretation of the Agreement, extends to all potential licensees of Botany's trademark.

It would therefore seem that the Agreement is a *prima facie* violation of section 8(e). The union, however, has propounded two arguments in an attempt to extricate the 1966 Agreement from the statutory interdict on hot cargo agreements. First, the union maintains that the Agreement is placed outside the reach of the section 8(e) prohibition by the garment industry exemption. Second, the union contends that the agreement involved here is not the type of agreement Congress intended to ban under section 8(e).

In order to properly construe the garment industry exemption, it is necessary to understand the nature of the garment industry, the reason for Congress' special treatment of the industry, and the extent of the garment industry exemption.

As described in the legislative history of the Labor-Management Reporting and Disclosure Act, the garment industry functions under a highly integrated jobber-contractor system of production. The jobber is responsible for the manufacture of the finished garment: he designs the garment, purchases the fabric and other necessary raw materials, and sometimes cuts the fabric in accordance with the design specifications. The pieces are then farmed out, or subcontracted, to other shops, known as contractors and subcontractors, who perform various steps in the manufacturing process, including cutting the fabric (if this has not been done by the jobber), sewing the pieces together, and finishing the garments. The completed product is then returned to the jobber for sale and distribution.

It is this jobber-contractor relationship to which the garment industry exemption is directed. The jobber is an independent business enterprise, having its own employees and its own labor-management relations. Similarly, the contractors and subcontractors, as independent business concerns, operate their own shops. Together they form a single integrated process of production; and, although ostensibly separate and unrelated concerns, they are totally dependent upon each other for their economic existence.

Yet, because the jobber initiates the manufacturing process, and because the contractor relies entirely upon the jobber for its work, a hierarchical structure, with the jobber at the pinnacle, evolved which lead to abuses during the early days of the garment industry. The jobber doled out work to the lowest bidder, forcing contractors to compete by reducing costs. The net result of this competition was the development of sweatshops in which employees worked for substandard wages under substandard working conditions. Eventually, in order to rid the industry of sweatshops, fairminded employers and labor organizations representing employees entered into agreements whereby the parties agreed not to do business with employers who did not operate under a union

contract. Such agreements are typical hot cargo agreements. Thus, when Congress began to consider the prohibition of hot cargo agreements, the effect of this prohibition upon garment industry practices was discussed. Initial proposals directed at prohibiting hot cargo agreements did not include a special garment industry exemption.[9] Indeed, House conferees, at first, opposed the inclusion of this exemption.[10] Industry supporters, however, realizing that such an exemption was necessary to preserve the stability within the garment industry,[11] urged that the exemption be adopted. Ultimately, over protestations that special favors should not be accorded to one industry over another,[12] Congress carved out, for the garment industry, certain exceptions from the general prohibitory language of section 8(e). But, it is quite clear that Congress intended the exemption to be an extremely limited one, restricted to employers and labor organizations who actively participate in the integrated process. The Conference Report of the House Managers stated that the statutory language "grant[ed] a limited exemption in three specific situations in the apparel and clothing industry . . . ." These situations, according to Sen. Barry Goldwater, one of the Joint Conferees, arise only

> where the relationship between such employer and other employers in said industry—that is, between primary and secondary employers—is that of a jobber, manufacturer, contractor, or subcontractor and where first, the subcontractor performs his work for and on the premises of the contractor, jobber, or manufacturer; or, second, the subcontractor performs his work for and on goods or materials supplied by such contractor, jobber, or manufacturer; or, third, one employer is engaged in an integrated process of production with the other employer.[13]

Thus, for the 1966 Agreement to be immunized from the section 8(e) bar, Botany must be an employer that meets one of these three conditions. Clearly, prior to Botany's acquisition of Levinsohn, Botany did not fall within the garment industry exemption because it did not sell, manufacture or perform, in any way, work on boys', students' and junior clothing; nor was it an employer performing parts of an integrated process which produced such apparel. Equally clear is the fact that Levinsohn, both prior to and subsequent to the Botany acquisition, was, and is, an employer engaged in the creation of boys', students' and junior clothing; and therefore was, and is, outside the reach of the section 8(e) ban. What is not readily apparent is the effect of the Levinsohn acquisition upon Botany's status. To be sure, the acquisition alone, which merely established a parent-subsidiary relation-

---

9. *See, e. g.* section 106 of the Kearns Bill, H.R.7265, 86th Cong., 1st Sess. § 106 (1959) as contained in I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 [hereinafter referred to as I Leg.Hist.] 586, 595; section 705 of the Landrum Bill, H.R.8400, 86th Cong., 1st Sess. § 705 (1959) as contained in I Leg. Hist., at 619, 683. See also the Elliott Bill, H.R.8342, 86th Cong., 1st Sess. § 705 (1959) as contained in I Leg.Hist. at 687 which was adopted by the House. Rep. Thompson, in discussing the difference between the House and Senate versions, noted that agreements in the garment industry were vulnerable to the ban on hot cargo agreements. II Legislative History of the Labor-Management Reporting Act of 1959 [hereinafter referred to as II Leg.Hist.] at 1708.

10. According to Rep. Thompson, a joint conference committee member, House conferees opposed the garment industry exemption for two weeks. Remarks of Rep. Thompson, II Leg.Hist. at 1721.

11. *See, e. g.*, remarks of Sen. Javits, II Leg. Hist. at 1384–1385, 1387; Sen. Kennedy, II Leg.Hist. at 1194–1195, 1377; Rep. Teller, II Leg.Hist. at 1680; Rep. Thompson, II Leg.Hist. at 1708; Rep. Halpern, II Leg. Hist. at 1736–1737. See also Analysis of Landrum-Griffin Labor Reform Bill by Representatives Thompson and Udall, II Leg. Hist. at 1576.

12. *See, e. g.* remarks of Reps. Roosevelt and Dent, II Leg.Hist. at 1729, 1732.

13. Remarks of Sen. Goldwater, II Leg.Hist. at 1857.

ship, did not automatically bring the parent corporation within the very limited section 8(e) exemption. One reason is that the parent-subsidiary relationship is not incorporated into the statutory scheme; and a reading of the legislative history reveals no indication that Congress intended to bring this relationship under the umbrella of the exemption. Indeed, because only an employer actively participating in the garment industry integrated process is exempt from the hot cargo prohibition, and because majority ownership of a corporation's stock does not, per se, transform a parent company into such an employer, the parent-subsidiary relationship should not be added to the section 8(e) exemption. Assuming, however, that section 8(e) should be amended to include this relationship, the change must be made by the legislature and not by the courts.

A second reason is that both the courts and the N.L.R.B. have consistently held that evidence of common ownership, without more, is insufficient to warrant the conclusion that two ostensibly separate employers have merged into a single employer subject to the provisions of the L.M.R.A.[14] To effectuate this merger, "something more" than common ownership is needed "in the form of common control, as it is usually phrased, denoting actual, as distinguished from merely potential, integration of operations and management policies."[15]

The criteria applied by the N.L.R.B. in determining whether sufficient integration of operations exists so as to create the requisite actual control are interrelation of operations, common management, centralized control of labor relations and common ownership or financial control. N.L.R.B. Twenty-first Ann.Rep. 14–15 (1956); cf. Radio & Television Broadcast Technicians Local 1264, IBEW v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 26 (1965) (per curiam). The Board, in its Twenty-first Annual Report, stated that "[n]o one of these factors has been held to be controlling, but the Board opinions have stressed the first three factors, which go to show 'operational integration,' particularly centralized control of labor relations."

■ Applying the Board criteria to the Botany-Levinsohn relationship, the following facts emerge. Levinsohn is a separate and distinct entity and not part of any integrated process of manufacture with Botany. Levinsohn is independently operated by a group of officers (only two of whom are officers of Botany) who are responsible for all the Levinsohn operations. Levinsohn totally

---

14. For illustrations of situations involving the question of whether two separate employers are a single employer under the labor laws, see Bachman Machine Co. v. N.L.R.B., 266 F.2d 599 (8th Cir. 1959); J. G. Roy & Sons v. N.L.R.B., 251 F.2d 771 (1st Cir. 1958); Television and Radio Artists, Washington-Baltimore Local, 185 N.L.R.B. 593 (1970); Los Angeles Newspaper Guild, Local 69, 185 N.L.R.B. 303 (1970); Okeh Caterers, 179 N.L.R.B. 535 (1969); Senco, Inc., 177 N.L.R.B. 882 (1969); Miami-Newspaper Printing Pressman, Local 46, 138 N.L.R.B. 1346 (1962), enf'd sub nom. Miami Newspaper Pressmen's Local v. N.L.R.B., 116 U.S.App.D.C. 192, 322 F.2d 405 (1963). See also Marlene Industries, 166 N.L.R.B. 703, enf'd sub nom. Decaturville Sportswear Co. v. N.L.R.B., 406 F.2d 886 (6th Cir. 1969) in which the Board found that a parent and its several subsidiaries constituted an integrated process of production. Mar-

lene is distinguished from the instant case because the parent and subsidiary do not form an integrated process of production.

15. Miami Newspaper Pressmen's Local v. N. L.R.B., 116 U.S.App.D.C. 243, 322 F.2d 405, 409 (1963), enf'g Miami Newspaper Printing Pressman's Local 46, 138 N.L.R.B. 1346, 1347–8 (1962). See also the Board's decision in Darlington Mfg. Co., 139 N.L.R.B. 241, 255 (1962), enforcement denied sub nom. Darlington Mfg. Co. v. N.L.R.B., 325 F.2d 682 (4th Cir. 1963) vacated and remanded, sub nom., Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), Darlington Mfg. Co., 160 N.L.R.B. No. 100, 65 L.R.R.M. 1391 (1967) enforced sub nom. Darlington Mfg. Co. v. N.L.R.B., 397 F.2d 760 (4th Cir. 1968), cert. denied, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969).

controls its entire manufacturing process: it purchases its own raw materials and converts them into finished garments through its own integrated process; it conducts its own advertising, sales and distribution program through sales and shipping departments which are in no way related to Botany; it maintains its own employment and personnel policies; it keeps its own business records; and, in general, it is responsible for the day-to-day operations of the manufacture and production of boys', students' and junior clothing. Levinsohn's financial relationship to Botany is, as a subsidiary, to account for profits and losses; and, as a licensee under the 1963 Agreement, to pay royalties on goods bearing the Botany label. Finally, the parent does not, in any manner, control or participate in either the overall or the daily labor relations of its subsidiary. Levinsohn pursues its own labor relations policy and maintains its own collective bargaining agreement with the Joint Board. Botany, on the other hand, takes no active role in the production, manufacture or sale of boys', students' and junior clothing; nor functions as a jobber, manufacturer, contractor or subcontractor within the Levinsohn integrated process. Nor is Botany involved in the daily operations of Levinsohn. In fact, Botany's sole involvement with the production, manufacture or sale of Levinsohn produced garments stems from the 1963 licensing agreement which remained in effect after the 1966 acquisition and which is limited to garments sold under the Botany trademark. As to these garments, Botany controls the quality and limits the retail establishments to which they can be sold; but, as to garments which either fail to meet the Botany standards (and are thus sold without a Botany label), or are not manufactured for sale under the Botany name, there are no restrictions. This licensing agreement, however, which was insufficient prior to acquisi-

tion to imbue in Botany the type of control necessary to merge two entities into one, is equally insufficient after acquisition to consummate the same merger.

In sum, it is clear that, while Botany has sufficient ownership interest to control Levinsohn's operations,[16] it does not do so. And, so long as Botany's control remains potential Botany and Levinsohn cannot be considered a single employer. Consequently, it cannot be said that Botany is an employer within the garment industry exemption. Botany is not a jobber, manufacturer, contractor or subcontractor of boys', students' or junior clothing; it does not work on goods of a jobber, manufacturer, contractor or subcontractor engaged in the production of such clothing; it does not work on the premises of a jobber, manufacturer, contractor or subcontractor engaged in the production of such clothing. It is not even involved in the specific subject area to which the exemption is directed: labor relations in the integrated process of production. Therefore, the agreement between Botany and the Joint Board is not protected by the garment industry exemption.

The union also attempts to avoid the impact of section 8(e) by arguing that the agreement is not the type Congress sought to eliminate by enacting the section. This argument is predicated upon the fact that some courts have rejected a literal reading of the statute, which would impose an absolute ban on all hot cargo agreements, and have validated certain agreements which would otherwise be outlawed by section 8(e). National Woodwork Mfrs. Ass'n v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed. 2d 357 (1967) (work preservation clause); Truck Drivers Union, Local 413 v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539, cert. denied 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964) (union standards clause). The union claims that the agreement represents a work

16. Majority stock ownership in a corporation has been held to be sufficient to fulfill the Board's requirement for finding common ownership. Darlington Mfg. Co., 139 N.L.R.B. at 255–256.

preservation clause and is therefore excepted, under *National Woodwork Mfrs. Ass'n, supra,* from the operation of section 8(e). The argument is unpersuasive.

In *National Woodwork Mfrs. Ass'n,* the Supreme Court held that section 8(e) does not prohibit agreements designed to preserve, for employees of a bargaining unit, work traditionally performed by those employees. To make this determination, an inquiry must be made "into whether, under all surrounding circumstances, the Union's objective was preservation of work for [the primary employer's] employees, or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere. . . . The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." 386 U.S. at 644–645, 87 S.Ct. at 1268 [footnotes omitted].

An examination of the facts of *National Woodwork Mfrs. Ass'n* serves to illustrate the scope of work preservation agreements. There, a general contractor on a housing project was subject to the provisions of a collective bargaining agreement which contained the following restriction: "No member of this District Council [of the United Brotherhood of Carpenters and Joiners of America] will handle . . . any doors . . . which have been fitted prior to being furnished on the job . . . ." Notwithstanding this provision, the general contractor ordered precut and prefitted doors from a manufacturer who was a member of plaintiff association. After the doors arrived at the job site, the union ordered its members not to hang them. The general contractor thereupon returned the prefabricated doors and replaced them with unfinished doors which were to be finished by carpenters on the job site. Subsequently, plaintiff association filed with the N.L.R.B. unfair labor practice charges against the union, alleging, *inter alia,* that the contract provision violated section 8(e). The Supreme Court, in rejecting plaintiff's argument, found that the cutting and fitting of the unfinished doors were "tasks traditionally performed . . . by the carpenters employed on the jobsite," 386 U.S. at 615–616, 87 S.Ct. at 1253; and that the object of the agreement was to protect the employees from losing work they had traditionally done.

Turning to the facts of the instant case, it cannot be said that the agreement is work-preservative. The most obvious shortcoming of the 1966 Agreement is that it is *not* "addressed to the labor relations of the contracting employer *vis-a-vis* his own employees." The labor relations which are the subject of the Joint Board's professed concern, and which are within the Supreme Court's formulation, are between an employer and its employees (and, to the extent applicable, its contractors and subcontractors) who are involved in the integrated process of production of boys', students' and junior clothing. As already discussed, Botany is not a part of this integrated process; nor is it involved in the labor relations of the integrated process. Therefore, the agreement is not to preserve the work of the employer's *own* employees.

Furthermore, notwithstanding the union's contention that its objective was to prevent Levinsohn from moving,[17] and is

---

17. Affidavit of Louis Hollander in Opposition to Motion to Vacate Arbitration Award, 71 Civ. 2381 (D.N.E.) (S.D.N.Y. June 7, 1971). It should be noted that the union's reasons for requesting arbitration are different from the purpose it sought to accomplish by entering into the Agreement. The request for arbitration was based upon a report that the Levinsohn operation was to be closed down; yet, the Agreement was not intended to cover this situation, but rather, it was to cover runaway shops. Although the issue involving the closing of an employer's business is not before this court, it is questionable whether the Levinsohn operation can be prevented from entirely shutting down. Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); Hoh v. Pepsico, Inc., 491 F.2d 556 (2nd Cir. 1974).

thus work-preservative, the language of the Agreement belies this contention and clearly indicates that the Agreement was "tactically calculated to satisfy union objectives elsewhere." The agreement forbids Botany to deal with any manufacturer of boys', students' and junior clothing unless that manufacturer operates under a collective bargaining agreement with the Joint Board. A similar restriction is placed upon Botany's ability to license its trademark. Neither of these conditions involves Levinsohn employees or persons performing parts of Levinsohn's integrated process or work traditionally performed by Levinsohn employees. Rather, they are directed towards Botany's relations with integrated processes, contractors, subcontractors, employers and employees who are totally divorced and unrelated from the Levinsohn operation. These factors plainly reveal the true intent underlying the agreement: to preserve work to the union as a whole and not the bargaining unit.[18] Indeed, if the union was actually interested in preserving the jobs traditionally performed by Levinsohn employees, the Agreement between it and Botany would have been limited only to the Levinsohn operation and would not have been so broad as to envelop the entire boys', students' and junior clothing subdivision of the garment industry.

Consequently, the Agreement is not saved by this judicially created exception to the ban on hot cargo agreements. Thus, having determined that the Agreement is void and unenforceable, it is obvious that the award which attempts to enforce the Agreement is likewise unenforceable. It is therefore unnecessary for this court to explore Botany's secondary line of attack which is directed to that portion of the award which re-stricts the licensing of the "Botany" trademark.

Accordingly, the award of Arbitrator Gray is hereby vacated.

So ordered.

---

18. Union signatory agreements (as opposed to union standards or work preservation agreements), which preserve work for the union as a whole, do not come within the exceptions to section 8(e). Truck Drivers Union, Local 413 v. N.L.R.B., 118 U.S.App. D.C. 149, 334 F.2d 539, cert. denied 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); Orange Belt District Council of Painters, Local 48 v. N.L.R.B. (D.C.Cir. 1964); Painters Local 1937 (Prince George's Center, Inc.), 183 N.L.R.B. No. 6 (1970); Painters Local 823, 161 N.L.R.B. 620 (1966).